**RICHMOND et ux. v. HOG CREEK OIL CO. et al. (No. 9394.)**

(Court of Civil Appeals of Texas. Ft. Worth. Dec. 4, 1920. Rehearing Denied Jan. 22, 1921.)

**1. Homestead &#9758;119—Husband and wife &#9758; 194—Acknowledgment of wife necessary in conveyance of separate property or homestead.**

In order for a married woman to convey her separate property or her homestead, it is necessary that her acknowledgment be taken to the instrument by an officer authorized to do so in the manner required by statute.

**2. Acknowledgment &#9758;56 — Conveyance by married woman, regular in form, good in hands of purchaser in good faith, though instrument was not explained by notary.**

Where a married woman executes a conveyance of her separate property or homestead, and such conveyance is accompanied with a certificate of acknowledgment regular in every respect, then the instrument is operative as against a purchaser in good faith who has paid a valuable consideration therefor, although notary has not properly explained the instrument to the married woman, and had her declare that she did not desire to retract it, as required by statute.

**3. Mines and minerals &#9758;58—One dollar consideration sufficient to support lease.**

A $1 consideration actually paid is sufficient to support an oil lease, particularly where the leased land is in an undeveloped territory, and one of the apparent material inducements to the execution of the lease is that the territory may be developed.

**4. Acknowledgment &#9758;62(2) — Finding that lessees were without notice of defective acknowledgment of wife sustained.**

In a suit to cancel an oil lease, a finding that defendants were without notice of a defective acknowledgment by plaintiff wife *held* sustained by the evidence, notwithstanding evidence that one of defendants was present at the time the acknowledgment was taken, and that notary did not remain with plaintiff's wife after the departure of plaintiff husband and lessee.

**5. Acknowledgment &#9758;25—Of married woman is "privily and apart" from husband if he is not within hearing distance.**

The requirement of the statute that the acknowledgment of a married woman "shall be privily and apart from her husband" is met if at the time the husband is not within distance to hear, or in any other matter exercise a possible influence over her by his presence or nearness.

**6. Mines and minerals &#9758;55(8)—Misrepresentation as to nature of conveyance not prejudicial held not ground for cancellation.**

It was not ground for cancellation of a conveyance of oil and gas, coal and other minerals underlying plaintiff's land, that grantees, or lessees, falsely and fraudulently represented that the instrument amounted to no more than a license to enter on and explore for oil and gas, with the incidental privileges of entering thereon, laying pipes, lines, etc., since plaintiffs were not prejudicially affected.

**7. Mines and minerals &#9758;55(8)—Representation that conveyance was lease mere legal opinion, not ground for cancellation.**

A representation that an instrument conveying minerals, oil and gas constituted a lease and not a conveyance was in the nature of a mere legal opinion, and was not ground for cancellation of the conveyance, in the absence of evidence to indicate that defendants knew any such expression to be false, or that it was made with any purpose to deceive or mislead.

**8. Appeal and error &#9758;742(1)—Assignment of error must be followed by proper proposition.**

To entitle an assignment of error to consideration, it must be followed by a proper proposition, and a question not presented in the

&#9758;For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

proposition will not be considered, under rule 29 (142 S. W. xii).

**9. Appeal and error ⬾742(4) — Proposition too general to require consideration.**

A proposition, "It was competent to prove by M. on cross-examination, if it was a fact, that he neglected his duty in the taking of the acknowledgments of another married woman to other oil and gas leases executed about the same time as the one in controversy, just as he neglected his duty in the taking of Mrs. R.'s acknowledgment," *held* too general to require consideration.

**10. Evidence ⬾129(5)—Taking of acknowledgments of other married women inadmissible to show failure of notary to comply with statutes in taking acknowledgment.**

In an action to cancel an oil and gas lease, where proper taking of acknowledgment by notary was in issue, evidence as to notary's failure to comply with the statutes in taking acknowledgments of other married women *held* not relevant.

**11. Witnesses ⬾405(1)—No impeachment as to immaterial matter.**

Where issue was whether notary complied with statutes in taking acknowledgment of a married woman, the fact that on one or more other occasions he failed to properly take the acknowledgments of other married women was immaterial, and, being immaterial, he could not be contradicted in respect thereto, and court did not err in not permitting plaintiffs to lay predicate of impeachment by proving that notary did not properly take acknowledgments of other women.

**12. Appeal and error ⬾1056(4)—Exclusion of evidence not prejudicial in view of determination.**

Exclusion of evidence that could only add force to appellant's contention concerning a certain fact could not be complained of, where the jury determined the issue in favor of appellant.

**13. Witnesses ⬾369—Proof of value of stock held by witness in defendant corporation irrelevant as affecting credibility.**

In an action to cancel an oil and gas lease, court did not err in refusing to allow plaintiffs to prove by defendant witness the value per share of the stock in the defendant oil company, some of which was owned by the witness, to affect his credibility, no attempt being made to show that the lease in question was of great value, and hence increased the temptation of witness to testify falsely, and it not appearing upon what leases the value of the stock was dependent.

**14. Mines and minerals ⬾79(4)—Lessee fulfilled obligations by depositing rentals in named bank.**

Where an oil and gas lease provided that rentals should be deposited in a named bank to the credit of lessor, that bank was thereby constituted an agent for the lessor for the receipt of the money, and all that was necessary for lessee to do on the day rentals were due was to deposit them in such bank to the credit of the lessor, and was not required to attempt to force lessor to go to the bank, or to receive the money, though lessor had instituted an action to cancel the lease.

**On Motion for Rehearing.**

**15. Appeal and error ⬾1058(1)—Rejection of mere cumulative evidence does not require reversal.**

Rejection of mere cumulative evidence does not constitute such an error as to require the reversal of a judgment.

**16. Fraud ⬾3—Elements.**

Fraud of itself is not a fact, but a conclusion to be drawn from facts, and includes as essential elements an intent, actual or implied, to deceive, and a loss or injury to the person deceived.

**17. Appeal and error ⬾931(3)—Findings by court implied in support of judgment.**

Appellate court will imply findings by the trial court in support of the judgment, where there is evidence to support such findings.

Appeal from District Court, Eastland County; E. A. Hill, Special Judge.

Suit by W. L. Richmond and wife against the Hog Creek Oil Company and others. Judgment for defendants, and plaintiffs appeal. Affirmed.

Grisham Bros., of Eastland, and Miller & Miller, of Fort Worth, for appellants.

Conner & McRae, of Eastland, for appellees.

CONNER, C. J. In the early spring of 1917, and prior to the development of any oil or gas in what is known as the Desdemona oil field, B. J. Johnson, B. H. Turner, and J. W. Carruth conceived the idea of securing a block of leases, to the end that that field might be tested for oil. Pursuant to that purpose, and with that explanation, B. J. Johnson approached the appellant W. L. Richmond, and secured from him and his wife, Mrs. M. A. Richmond, a lease contract covering their rural homestead, dated June 17, 1917. The contract purported on its face to have been duly acknowledged by one J. B. McEntire. Appellants instituted this suit to cancel the contract, alleging as grounds therefor: First, that it had been secured by means of false and fraudulent representations; second, that it had not been duly acknowledged by the appellant M. A. Richmond, a married woman, as required by the statutes of Texas; and, third, that a well was not commenced on said land within one year after the execution of the contract, or rentals of 50 cents per acre paid, as provided for in the lease. A further statement of the facts and pertinent allegations will be made in connection with our discussion of the propositions presented. The case was submitted to a jury upon special issues, and upon the jury's find-

⬾For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ings the court entered a judgment for the defendants, and the plaintiffs have appealed.

The fraud alleged consisted of allegations to the effect that McEntire and Johnson, who secured the lease, were partners with the others engaged in the enterprise, and that they falsely and fraudulently represented that the instruments which they induced the plaintiffs to execute amounted to no more than a license to enter upon and explore their homestead for oil and gas, with the incidental privileges of entering thereon, laying pipe lines, etc., whereas, in fact, the instrument executed was, in legal effect, a conveyance of the minerals in the land. It was further alleged that McEntire, who took the acknowledgment, was an agent and partner interested in the subject-matter of the lease, and that he did not fully explain to Mrs. M. A. Richmond the instrument separate and apart from her husband, as provided by law, of which it was alleged that Johnson had notice.

The jury found in answer to special issues that J. B. McEntire did not explain the oil and gas lease to the plaintiff, Mrs. Richmond, privily and apart from her husband, but they further found that none of the defendants had any knowledge or notice thereof. The jury further found that McEntire at the time was not a partner or agent of any of the other defendants, nor interested in the subject-matter.

There was evidence to the effect that W. L. Richmond was in the field at the time Johnson and McEntire appeared upon the premises, and that the three together went to the house, and after some conversation called Mrs. Richmond from within, and that she appeared and read and signed the instrument, and the officer took her acknowledgment while Johnson and her husband, W. L. Richmond, were near, but just how near has not been made to appear. At this point, however, there is a controversy relating to the effect of the evidence. The defendants offered testimony tending to show that before Mrs. Richmond acknowledged the lease Johnson and Richmond left the immediate vicinity of the house to go to another point on the farm, while the plaintiffs sought to show that McEntire did not remain with Mrs. Richmond after the departure of Johnson and Richmond, but that, on the contrary, he left the house with those parties, and hence Johnson must have known of the faults in the acknowledgment. The jury on this point found that McEntire, the notary, did not remain with Mrs. Richmond after Johnson and Richmond left her presence.

The lease provided that in case operations for the drilling of a well for oil and gas or other minerals was not commenced and prosecuted with due diligence within one year from the date of the lease, then the grant should become null and void as to both parties, but provided that the lessees might pre-vent such forfeiture from year to year by paying to the lessors the sum of 50 cents per acre per annum until such well was commenced, and that such payments might be made "at the First National Bank of Gorman or payable direct" to the lessors. The jury further found that the defendants, on or before July 17, 1918, had deposited in the said bank of Gorman the ground rent of 50 cents per acre, as provided for in the lease. The jury further found that the defendants in obtaining the lease did so for the purpose of development, and not for speculative purposes. We here quote the following clauses of the lease under consideration, omitting unnecessary parts:

"The State of Texas, County of Eastland.

"Know all men by these presents: That we, W. L. Richmond and M. A. Richmond, husband and wife, of Eastland county, Texas, the parties of the first part, in consideration of the sum of $1.00, paid by B. J. Johnson, B. H. Turner and J. W. Carruth & Co., parties of the second part, the receipt of which is hereby acknowledged and the further consideration hereinafter mentioned, have granted, bargained, sold and conveyed, and do by these presents grant, bargain, sell and convey unto the said parties of the second part, their heirs, assigns, all of the oil, gas and coal and other minerals in and under the following described land, together with the right of ingress and egress at all times for the purpose of drilling, mining and operating for mineral and to conduct all operations and to lay all pipe necessary for the production, mining and transportation of the oil, gas, water, coal or other mineral, with the right to use sufficient water, gas or oil to operate said property, and shall have the right to remove all machinery, fixtures, and improvements placed thereon at any time, reserving, however, to the parties of the first part the equal one-eighth of all oil produced and saved upon said premises to be delivered in the pipe line to the credit of the parties of the first part free of charge. * * *

"To have and to hold the above-described premises unto the said parties of the second part, their heirs and assigns, on the following conditions: In case operations for either the drilling of a well for oil, gas, mining or other minerals is not commenced and prosecuted with due diligence within one year from this date, then this grant shall immediately become null and void as to both parties; provided, that second party may prevent such forfeiture from year to year by paying to the first party the sum of $.50 per acre per annum until such well is commenced, or until shipments from such mines have begun, and it is agreed that the completion of a well shall operate as a full liquidation of all rental under this provision during the remainder of the term of this lease, which payments can be made at First National Bank of Gorman or payable direct to parties of the first part.

"In case the parties of the second part should bore and discover either water, oil or other minerals, then in that event this grant, incumbrance or conveyance shall be in full force and effect for twenty-five years from the time of the discovery of said product, and as much

longer as oil, water, gas or other minerals can be produced in paying quantities thereon. Whenever sales are being made of the product produced on the land above described, a settlement thereof shall be made at the end of each quarter.

"This grant is not intended as a mere franchise, but is intended as a conveyance of the property above described for the purpose herein mentioned, and it is so understood by both parties to this agreement.

"The parties of the second part may at any time execute an assignment admitting and declaring this contract canceled, and upon delivery of the same to the parties of the first part or upon the filing of the same for record, this contract and all liabilities and payments under it, from and after such time, shall cease and determine.

"It is understood between the parties to this agreement that all conditions between the parties hereunto shall extend to their heirs, executors, administrators, and assigns."

The jury further found that at the time of obtaining the oil and gas lease in controversy Johnson and McEntire represented to plaintiff:

"That such contract was only a license to explore for oil and gas, and not a grant of any part of the land * * * and that the plaintiffs believed such representations and relied thereon."

[1, 2] Appellants insist that the court erred in overruling their motion to enter a judgment in their favor upon the findings above stated. It is urged that the consideration of the $1 recited in the lease, and which the evidence shows was in fact paid, is but a nominal one, and that therefore the finding of the jury to the effect that the lease had not been acknowledged in the manner required by law rendered the lease inoperative as against the homestead. There can be no doubt of the general proposition that in order for a married woman to convey her separate property or her homestead it is necessary that her acknowledgment be taken to the instrument by an officer authorized to do so in the manner required by our statutes. The statutes require the notary to fully explain the instrument to such married woman, and take her acknowledgment separate and apart from her husband, and after such explanation she must execute the instrument and declare that she did not desire to retract it. The finding of the jury on this issue has not been attacked as unsupported by the evidence, although the notary public, McEntire, testified that he complied with the statute in taking Mrs. Richmond's acknowledgment. It is, however, equally well settled that a married woman who executes a conveyance of the kind, and such conveyance is accompanied with a certificate of acknowledgment regular in every respect, then the instrument is operative as against a purchaser in good faith who has paid a valuable consideration therefor. To illustrate, we may take the case of

Webb v. Burney, 70 Tex. 322, 7 S. W. 841. In that case Burney, his wife and son swore that in executing the deed in controversy that Burney told his wife, out of the hearing of the notary, that the instrument was only a mortgage, and did not touch the homestead; that she refused to sign the same, and he said it would be his ruin if she did not, and threatened to abandon her. The acknowledgment of Mrs. Burney, as certified to by the notary, was in the usual form as required in a conveyance by a married woman of the homestead, and in such condition the deed was handed to the purchasers, they being ignorant of any threats of Burney to his wife, or of any defect in the acknowledgment. The notary swore that the law was strictly complied with. The court said:

"It is contended by appellees that there was no valuable and adequate consideration for the deed, and this would authorize the wife to impeach the certificate of acknowledgment. There are expressions in some of the cases which indicate that there must be a valuable and adequate consideration paid by the grantee in order to prohibit the wife from impeaching the certificate. Waltee v. Weaver, 57 Tex. 571, and other cases cited. * * * But it is insisted the consideration must not be inadequate; that if it is the wife can show the certificate of the officer is false, notwithstanding the innocence and good faith of the purchaser. Inadequacy of price does not mean inadequacy of value; it means such gross inequality as would shock the conscience, and arouse suspicion as to the honesty of the transaction. * * *

"Where there is palpable and gross inequality in a bargain, courts will carefully scrutinize the conduct of the parties to ascertain if there was fraud, imposition, and undue influence, and if it be found, though slight, relief will be granted. In case of a married woman's deed, if it appear that the consideration is so grossly inadequate as to raise a suspicion that she did not understand the transaction, or that she certainly would not voluntarily have consented to it upon the terms expressed, the grantee, otherwise innocent, might be presumed to know or suspect that she had not willingly contracted, or that some undue influence had been exercised over her to induce her to contract. In such a case it would be the duty of the purchaser to inquire and learn the true condition of affairs, and in such case the certificate of the officer could be impeached and shown to be false. * * * It does not satisfactorily appear from the evidence and the conclusions filed that the court was of opinion that the consideration was so shockingly inadequate as to require Cole Bros. to ascertain if Mrs. Burney had willingly signed and acknowledged the deed.

"We, therefore, conclude that the mere fact that Burney imposed upon his wife and by misrepresentations induced her to sign the deed, coupled with the fact (if it existed) that the notary did not comply with the law in taking her acknowledgment, could not affect the rights of Cole Bros. under the deed; they being ignorant of the facts. * * *

"That when the consideration of a deed by a married woman is so grossly inadequate and

unreasonable as to excite suspicion of unfairness and undue influence, or of want of willingness to execute the same, the purchaser would be put upon inquiry as to the truth of the certificate of her privy examination and acknowledgment, and that in such case she could show its falsity. The findings of the court being satisfactory to us that such was his conclusion, there was no sufficient reason shown to warrant Mrs. Burney in impeaching the certificate of her acknowledgment, and for this reason the judgment of the court below should be reversed, and the cause remanded for a new trial."

[3] It has been frequently held by this court and others that a $1 consideration actually paid, as here, is sufficient to support an oil lease, and this is particularly true, we think, in cases, as here, where the leased land is in an undeveloped territory, and where, as here, one of the apparent material inducements to the execution of the lease is that the territory may be developed. Lone Star Gas Co. v. McCullough, 220 S. W. 1114. The trial court, therefore, would not have been authorized to disregard the finding that none of the defendants had knowledge or notice of the failure of McEntire to properly take Mrs. Richmond's acknowledgment on the mere ground that the consideration was nominal.

[4] However, the finding that the defendants were without notice of the defective acknowledgment is indirectly attacked by the contention that the evidence shows that Johnson was present, together with Mr. Richmond, Mrs. Richmond, and the notary at the time the acknowledgment was taken, and also by the conflicting finding to the effect that the notary did not remain with Mrs. Richmond after the departure of Johnson and Richmond. This latter finding is manifestly but evidentiary in its character. If true, though denied by the notary, that he left the premises with the other parties named, it but tends to show that the other parties were present during the time the notary took Mrs. Richmond's acknowledgment, and hence that Johnson had knowledge of the vice in the acknowledgment. In such cases it is the ultimate and not the evidentiary fact that must control. The evidence relied upon as tending to show that Johnson had knowledge of the vice in the acknowledgment, in the absence of a direct attack upon the finding that Johnson was without knowledge, could very properly be ignored, but the case is an important one, and we will refer to it briefly. In substance, it was to the effect that the home of the appellants was a building extending east and west, with one room on the west, one on the east, and a hallway between the two rooms, and a kitchen back of the east room; the doors to the east and west rooms opened upon the hallway; along the front was a porch; and when Richmond, Johnson, and McEntire came from the field to the house they stopped either at or upon the porch, and, as before stated, after some conversation Mrs. Richmond was called from the kitchen—we infer, at least she came out into the hallway from the east room—and the testimony shows that she then signed the lease, after reading it, upon a sewing machine sitting at the south end of the hallway and near the east room. The evidence fails to show, as before stated, the exact location of Johnson at this time. It does not show that either Johnson or Richmond were in the immediate presence of the notary and Mrs. Richmond.

[5] It cannot be said from the evidence that they were not at this time on the south edge of the porch or in the yard in front of the porch, and beyond the hearing of the notary and Mrs. Richmond, or whether at the time Johnson and Richmond were so engaged in conversation or otherwise as to be inattentive. From the whole, it cannot be said, we think, that the fact, if accepted as true, that McEntire and Johnson and Richmond all left the presence of Mrs. Richmond at the same time, necessarily proves knowledge on Johnson's part, or necessarily conflicts with the finding that Johnson had neither notice nor knowledge of McEntire's failure to properly take Mrs. Richmond's acknowledgment. The requirement of the statute that the acknowledgment of a married woman, "shall be privily and apart from her husband" is evidently met if at the time the husband is not in such proximity or affected by such circumstances as to be able with the wife's knowledge to overhear the explanations of the notary and the wife's responses to the officer's interrogatories, or in any other matter exercise a possible influence over her by his presence or nearness. See Speer's Law of Marital Rights in Texas, page 255, par. 204.

There yet remains, however, a determination of the effect to be given to the lease in controversy and the finding of the jury that it was secured by means of the representation that it was a mere lease or license to enter upon appellants' land to explore it for oil and gas. Appellants contend that the instrument under consideration is not a mere lease or license, but, on the contrary, amounts to a grant of an interest in the homestead, and hence that the representation to the contrary and the finding of the jury that it was made as alleged by appellants, and that they relied upon the representation required the judgment in appellants' favor. If these contentions must be upheld and the representations were material and misled appellants to their injury, then indeed the judgment should have been for appellants on the issue of fraud, regardless of the other findings.

The instrument under consideration, as will be seen by a reference to those parts of it that we have quoted, recites that the grantors "have granted, bargained, sold and con-

veyed, and do by these presents grant, bargain, sell and convey," unto the lessees, their heirs and assigns, "all the oil, gas, coal and other minerals in and under" the land constituting appellants' homestead. The lease also contains the express declaration that:

"This grant is not intended as a mere franchise but is intended as a conveyance of the property above described for the purpose herein mentioned, and it is so understood by both parties to this agreement."

The terms quoted seem very similar, if not identical, to the terms employed in the lease under consideration by the Supreme Court in the case of Texas Co. v. Daugherty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917F, 989. In that case it was held that the instrument amounted to more than a mere license, that it operated to convey an interest in land, and the case before us is perhaps not distinguishable in this respect from that case. It is to be observed, however, that in the Daugherty Case the question was whether the instrument conveyed such an interest in the land as was taxable under article 7504, Rev. Statutes, which declares that—

"Real property, for the purpose of taxation, shall be construed to include the land itself, whether laid out in town lots or otherwise, and all the buildings, structures and improvements, or other fixtures of whatsoever kind thereon, and all the rights and privileges belonging or in any wise appertaining thereto, and all mines, * * * quarries and fossils in and under the same."

It was held that the interest of the Texas Company, under its lease, was taxable under the statute referred to. But construing the instrument before us as a whole, as required by the rules of construction, we fail to see the materiality of the distinction that appellants seek to make. In a sense the instrument may be very naturally designated as an oil lease, as the parties did designate it, and there is nothing in the record to indicate that the parties had in mind the technical distinction between a mere lease or license and a grant. In the usual terms relating to oil leases it provides for the entry upon the land for the purpose of drilling, reserves for the grantors the usual royalty, and in the very clause of the instrument which declares that it was not intended as a mere franchise the intention of the instrument is expressed. It says:

"This grant is not intended as a mere franchise, but is intended as a conveyance of the property above described for the purpose herein mentioned, and it is so understood by the parties to the agreement."

What was the purpose? It is evident that the purpose of the instrument, and the only purpose, was that the lessees might explore the land for oil and gas, and, if found, to reduce those minerals to possession and appropriation. Whether the instrument amounts to a mere license to explore for minerals or to a grant for that purpose seems to us to be wholly immaterial in the determination of any of appellants' rights in the present controversy. For, as already shown, the lessees paid a valuable consideration for the lease. In consequence of this they obtained the right to explore appellants' land for oil and gas, and to appropriate it to their own use if developed just as efficiently whether the instrument be construed as a conveyance or an interest in land or as a lease or franchise for the purpose of development.

In the case of Bremond v. McLean, 45 Tex. 10, a misrepresentation as to the character of a note was relied upon, and our Supreme Court said:

"It does not appear from the petition that plaintiff suffered any injury from the alleged false and fraudulent representations as to the character of the note transferred to him, or that the note would or could possibly have been of any greater value to him than it was if appellant's representations respecting it had been true. * * * The false representations of the defendants in reference thereto could in no way injure the plaintiff, and consequently are not actionable."

In Davidson v. McKinley, 152 S. W. 1142, 1148, the court said:

"Thompson cannot plead such acts, if fraudulent, as a satisfaction of the vendee's lease, unless he also shows that thereby he was induced to change his condition for the worse, or that he was in some way injured thereby."

In Alamo Auto Sales Co. v. Herms, 184 S. W. 740, the court said:

"If there had been any fraud in the representation as to the capacity of the truck, the evidence failed to show that appellee was injured thereby, and he would not, on a misrepresentation which did not damage him, be entitled to rescind the contract."

In Moore v. Cross, 87 Tex. 557, 29 S. W. 1051, the court said:

"If the promises of Moore be considered as representations fraudulently made, they belong to that class of frauds for which there is no redress in courts, because there was no pecuniary injury resulting from them, and courts do not undertake to deal with the breach of moral obligations."

[6, 7] We conclude that the misrepresentations relied upon by appellants in this case in no way prejudicially affected their rights, and therefore the contract under consideration cannot be rescinded on that ground. Moreover, in this connection, we think we may properly add that the representation that the instrument constituted a lease and not a conveyance is in the nature of a mere legal opinion as to the legal effect of the terms used, and that, as before suggested, there is nothing in the evidence to indicate that appellees knew any such expression to be false, or that it was made with any pur-

pose to deceive or mislead appellants. The evidence tends to show that while the appellant W. L. Richmond could not read, his wife could do so, and that she did read it. There is nothing in the case to indicate that the appellees occupied any special relation of trust or confidence; on the contrary, it seems to have been an ordinary case of negotiations between grantor and grantee.

[8] We must also determine the issue presented which relates to the allegations of partnership, as indicated in an earlier part of this opinion. The plaintiffs, as a means of effecting all of the defendants with notice that the acknowledgment had not been taken in the necessary manner, alleged that McEntire, the notary, was an agent and partner of the other defendants, Johnson, Turner, and Carruth, and also that McEntire was interested in the subject-matter of the contract. It will be remembered that the jury in answer to special issues found that McEntire was neither a partner nor agent of the other defendants, and that he was not interested in the subject-matter of the contract. But appellants in their third, fourth, and fifth assignments of error complain of the court's action in rejecting certain evidence on this issue. We will not quote the assignments, for they are grouped, but limit them to the propositions thereunder; it being the rule that, to entitle an assignment to consideration, it must be followed by a proper proposition, and that a question not presented in the proposition will not be considered. See rule 29 (142 S. W. xii), relating to preparation of briefs. S. A. & A. P. Ry. Co. v. Wood, 41 Tex. Civ. App. 226, 92 S. W. 259; H. & T. C. Ry. Co. v. Hanks, 58 Tex. Civ. App. 298, 124 S. W. 136; Pullman v. Vanderhoeven, 48 Tex. Civ. App. 414, 107 S. W. 148. But two propositions are presented under the group of assignments mentioned. The first is that—

"It was competent to prove by McEntire on cross-examination, if it was a fact, that he neglected his duty in the taking of the acknowledgments of other married women to other oil and gas leases executed about the same time as the one in controversy, just as he neglected his duty in the taking of Mrs. Richmond's acknowledgment."

The second proposition thus reads:

"Upon denial by McEntire that he had neglected his duty in taking the acknowledgments of other married women to oil and gas leases executed about the same time as the one in controversy, it was competent to impeach him by proving the falsity of his testimony upon said points by the wives and their husbands whose acknowledgments were certified by McEntire and not taken by him in accordance with the provisions of the statutes."

[9-12] It is shown in the statement under these assignments that the plaintiffs were not permitted to lay the predicate of impeachment of the witness McEntire by proving

that he did not take the acknowledgments of Mrs. C. O. Terrell, Mrs. J. M. Sparks, Mrs. W. R. Carruth, Mrs. Jim Foote, Mrs. Vincent, Mrs. I. C. Parry, Mrs. Dick Gray, Mrs. W. S. Witt, Mrs. E. S. Davis, Mrs. T. W. Emde, and Mrs. W. D. McArthur. We feel no hesitation in sustaining the ruling of the trial court in the matter thus presented. It seems clear that no error is pointed out in appellants' first proposition that we have quoted. It is entirely too general. But regardless of this suggestion and considering the two propositions together, it seems evident that to permit an investigation of the manner in which McEntire took the acknowledgments of the ladies named would be to enter upon a determination of a multiplied number of issues without any direct relevancy in the present suit. As we understand the rule, this cannot be done. The issue in the present suit was whether McEntire complied with our statutes in taking the acknowledgment of Mrs. Richmond, and the fact that on one or more other occasions he failed to properly take the acknowledgments of other married women was immaterial, and, being immaterial, he could not be contradicted in respect thereto. Wharton's Crim. Evidence (9th Ed.) p. 484; Rainey v. State, 20 Tex. App. 473; Hart v. State, 15 Tex. App. 202, 49 Am. Rep. 188; Hays v. Miller, 77 Pa. 238, 18 Am. Rep. 445; Dean v. Dean, 214 S. W. 505; G., H. & S. A. Ry. Co. v. Davis, 92 Tex. 373, 48 S. W. 570. Moreover, the only probative effect that could properly be given effect, if proven, that McEntire failed to regularly take the acknowledgments of the married women named, would be to add force to appellants' contention that McEntire did not take Mrs. Richmond's acknowledgment as it should have been done under the statute. This the jury found to be true, and appellants need no additional proof of that fact. Nevertheless, it is unavailable in behalf of appellants because of the findings that the defendant Johnson had no notice of the irregularity, and that McEntire was neither the agent nor the partner of the other defendants. So that, in no event, was the rejection of the offered proof prejudicial.

What we have said in disposing of the assignments and propositions last mentioned also sufficiently disposes, we think, of another contention to the effect that the court erred in refusing to permit appellants to lay a predicate for the impeachment of McEntire by proving by him that he did not say to a Dr. Morehead, in a conversation at Desdemona, or in the vicinity, in 1917, and before he executed any oil and gas contract with Johnson, Turner, and Carruth, that Johnson and Turner were all right, and that before he became interested with them in that business (that is, meaning the business of procuring leases including the lease in controversy) he either wrote a letter or made inquiries of parties where they lived and ascertained that

they were all right and fully able to put down a well and do what they were proposing to do.

[13] Appellants make a further contention in the seventh assignment of error that the court erred in refusing to allow the plaintiffs to prove by McEntire the value per share of the stock in the Hog Creek Oil Company, some of which was owned by the said McEntire, "for the purpose of showing the interest of the said McEntire as a witness to affect his credibility." In this connection it should be stated that it was shown in the evidence that some time in the fall of 1917, after the lease from the appellants herein and others had been secured, and after the institution of this suit, an association was formed for the purpose of developing the property designated as the "Hog Creek Oil Company," to which were assigned all the leases secured by Johnson, Turner, and Carruth. The association was capitalized in the sum of $60,000, of which 50 shares of stock of the par value of $100 each were assigned to McEntire. We fail to see any prejudicial error in the court's ruling on this subject. The evidence was before the jury that the Hog Creek Oil Company at the time of the trial owned the property that had been secured by Johnson, Turner, and Carruth, and that of the 600 shares into which the capital stock had been divided McEntire owned 50, and hence that he (McEntire) was interested to that extent in the lease in question. It was proper to develop McEntire's interest in the subject-matter in litigation, but the real issue in this respect was not McEntire's interest in the association, or in its stock, or in the value of the stock. The value of the stock was dependent upon the entire assets of the association, and may have been formed or derived from developments on other leases entirely disconnected with that of appellants. For the purpose of showing McEntire's interest, it may have been relevant to show that the Richmond lease—the one under consideration—was of great value, and hence increased the temptation of McEntire to testify falsely. But no attempt of this kind was made, and proof of the value of stock based upon all the leases and possible developments upon leases other than the one under consideration was irrelevant. At least we see no prejudicial error in the rejection of the offered proof.

[14] What we have said has been in the effort to answer the assignments and propositions upon which appellants rely for their contention that the court should have entered a judgment in their favor upon the verdict of the jury. A further material question presented by the assignments is to the effect that the court erred in refusing to submit a special issue, calling for an answer of the jury as to whether or not appellants had been paid the rentals provided for in the lease. We see no prejudicial error in the action of the court in refusing to submit this issue, for the reason that the proof on the subject is undisputed. It is true that no well was drilled within the year, and it is further true that neither Richmond nor his wife actually received the rentals provided for in the lease, but it is undisputed in the evidence, not only that this suit was instituted by appellants prior to the due date of such payments, but also that the appellees forwarded to and deposited in the Gorman bank the full amount of the rentals, and that the bank received such deposits and entered them to the credit of the appellants, and they were duly notified thereof. Notwithstanding such deposits and notification, appellants refused to accept payment of the rents, and so notified the bank. The institution of the suit itself amounted in effect to a declaration on their part that the contract was repudiated, and that they would no further recognize its terms as valid. The terms of the lease relating to the payment of the rentals are that they might be "made at the First National Bank of Gorman or payable direct to parties of the first part." We have held, as also have other Courts of Civil Appeals, that in cases where a lease provided that rentals shall be deposited in a named bank to the credit of a lessor that the bank is thereby constituted the agent for the lessor for the receipt of money, and that all that is necessary in such cases for the lessee to do is within the time provided for to so make the deposit to the credit of the lessor. But appellants have cited a number of cases, including Ward v. Smith, 7 Wall. 447, 19 L. Ed. 207, Glatt v. Fortman, 120 Md. 384, 22 N. E. 300, Kelsay v. Taylor, 56 Or. 13, 107 Pac. 609, Nat. Bank v. Hyatt, 75 Ark. 170, 86 S. W. 1002, 112 Am. St. Rep. 50, 5 Ann. Cas. 296, Dillingham v. Parks, 30 Ind. App. 61, 65 N. E. 300, and Adams v. Hackensack Imp. Co., 44 N. J. Law, 638, 43 Am. Rep. 406, to the effect that the rule referred to does not apply in this case. These cases, in so far as we have been able to consider them, seem to be cases where a money obligation was, by its terms, merely made payable "at" a given bank, and it was held that the mere deposit in the bank, either without the consent of the creditor, or where the obligation had not been deposited with the bank with the authority from the creditor to receive the payment, did not discharge the obligation, but that the money deposited remained in the bank at the risk of the depositor. The case before us, however, is distinguishable, we think, from the cases referred to. The contract under consideration must be held to mean something. The specific provision that payments of rentals might be made at the Gorman bank was an option given to appellees which is supported by the original consideration. When appellees therefore made the deposit in strict accordance with the terms of the contract, the duty was imposed

upon appellants to present themselves at that bank to receive the money, but this they refused to do. Appellees in order to preserve their rights were not required to attempt to force appellants to go to the bank or to receive the money. They did all within their power to perform their obligation. A similar deposit, under a lease worded as in the contract before us, was held to amount to payment in McKay v. Kilcrease, 220 S. W. 177. But it is not necessary in order to sustain the judgment below that we shall adopt the conclusion reached by the case last cited, for we think a deposit, under the circumstances quoted, at least amounted to a tender of the money, and was as effectual for the preservation of appellees' rights as if appellants had received it.

In the case of White v. Dennis, 220 S. W. 161, in an opinion by Associate Justice Dunklin of this court, it was said:

"It seems to be well settled that the right to an actual and formal tender of the money due is waived when the debtor offers to pay, and is ready, willing, and able to do so, but is prevented from so doing, where the party to whom the money is due expressly declares that he will not accept the tender, if made, or repudiates the contract."

26 Ruling Case Law, p. 624, par. 3, reads:

"Since the law does not require any one do vain and useless things, a formal tender is never required, where it appears that if it had been made, the money would not have been received, as where a creditor states that an actual tender will be useless, because he will not accept it, or where one party to a contract states he will not comply with its terms. * * * It is not necessary that the person making the tender should have the money in his own possession on the spot. If the sum offered is absolutely refused, it is enough that the money was on the spot and ready for the purpose, although in the possession of another."

In the same volume of the same authority, p. 630, par. 9, it is said:

"It is a well-settled principle of law that a tender may be made as well by an authorized agent as by a debtor himself, when a creditor either knows that the agent is duly authorized to make the tender, or has reasonable opportunity to find out whether the agent has the authority. But where the creditor does not understand this, the agent is in the position of a stranger, and the tender is not good."

In 22 Cyc. 1557, we find the following:

"Where a debt is payable at a particular time and place, and the debtor provides sufficient funds in such time and place to pay the debt, it is generally held that such readiness to make payment, if maintained, amounts to a legal tender, and interest is accordingly denied during the time the funds are so held for the purpose of making such payment."

In the case of Stansbury v. Embrey, 128 Tenn. 103, 158 S. W. 991, 47 L. R. A. (N. S.)

980, Judge Williams of the Tennessee Supreme Court said:

"It is then insisted by defendant Embrey that, since the deposit did not constitute a payment, it also failed of being a tender, that a tender cannot be made to a person who is not authorized to receive payment, and that payment and tender hangs by the same thread, so that when one falls the other falls. In this there is a failure to distinguish. The making of a note payable at a named bank entitles the maker to resort to that bank to tender payment; and, if the note be not there, the tender avails, nevertheless, to arrest the running of interest, to save his right, or to prevent a forfeiture. Cheney v. Libby, supra; Cheney v. Bilby, 36 U. S. App. 720; 74 Fed. 52, 20 C. C. A. 291; 22 Cyc. 1555; 38 Cyc. 151, 152."

The case of Gillispie v. Fulton Oil & Gas Co., 236 Ill. 188, 86 N. E. 219, was one in which it appeared that the day before the due date of a payment of rentals, provided for in an oil lease, the lessee deposited for the lessor's use and to his credit in his bank the necessary amount. The court said:

"If it be said that this was not a payment to Bowman, it is a sufficient answer to such suggestion that Bowman, when notified that the money had been left for him at the bank, refused to accept the same, basing his refusal upon the ground that the lease was void. In his letter to the bank Bowman clearly waived any duty that appellant might have been under to make a legal tender to him of rent by indicating his purpose not to receive any rent under this lease."

We conclude this branch of the subject by saying that we think the facts show that appellants are in no attitude to insist that the lease under consideration should be forfeited because of a want of payment to them of the rentals provided for in the lease.

Appellants present a number of other assignments of error which relate to incidental rulings and questions, but because of the length to which we have already extended this opinion, we will not undertake to discuss them seriatim. We think it will be sufficient to say that all assignments have been examined and considered, and we find in them no reversible error. Appellees in their briefs adequately treat these questions, and we think they are sufficiently answered by what we have already said. The charge sufficiently covered the vital issues in the case, and we see no substantial reason why we should indulge in further discussion or disturb the judgment below.

All assignments of error are accordingly overruled, and the judgment affirmed.

### On Motion for Rehearing.

Appellants point out an inaccuracy in our original opinion which we desire to correct. In one or more places we stated that Mrs. Richmond read the lease under consideration. In this we were in error. Her testimony on the point was:

"He [meaning McEntire] didn't read it [meaning said oil and gas lease contract] to me, nor I didn't read it myself."

While this statement of Mrs. Richmond is not specifically contradicted by the testimony of any other witness, at least two of the other witnesses, B. J. Johnson and J. B. McEntire, testified that the lease was read to Mrs. Richmond, which, if found to be true, as must be implied in aid of the judgment, was fully as effective in apprising Mrs. Richmond of the contents of the lease as if she had read it herself, and there is no contention that if the lease was read to Mrs. Richmond, as these witnesses testify, that it was misread to her. We therefore conclude that the inaccuracy noted is immaterial.

A determined assault is also made upon our disposition of appellants' sixth assignment of error, complaining of the court's refusal to permit appellants to lay a predicate for the impeachment of McEntire by the testimony of Dr. Morehead, who, it is alleged, would have testified to certain declarations of McEntire tending to show that he (McEntire) was interested in the leases taken during the time that the one in question was secured. The bill of exception shows, substantially, that this effort was after both appellants and appellees had closed their testimony in chief, and that to the effort of appellants to recall McEntire for the purpose of impeachment objection on this ground, among others, was made and sustained by the court. We think appellees in their brief satisfactorily dispose of this assignment, to which we will add, as stated by Mr. Greenleaf, vol. 1, § 447, that:

"The general course of the examination of witnesses is subject to the discretion of the judge, it is not easy to establish a rule, which shall do more than guide, without imperatively controlling the exercise of that discretion."

And in a note to the text in the case of Wallace v. Taunton Street Railway, 119 Mass. 91, it is said:

"The discretion is not subject to review, unless it is shown to have been grossly and oppressively abused."

[15] If, as is perhaps deducible from some of the contentions made under this assignment, the effort was made to introduce through Dr. Morehead the declarations of McEntire that he was interested, we think it must be said, among other things, that the evidence was but cumulative, inasmuch as declarations of like import by McEntire were introduced in the testimony of two other witnesses, and cases must be rare, if any, where the rejection of mere cumulative evidence constitutes such an error as to require the reversal of a judgment.

[16, 17] Appellants also insist that the finding of the jury to the effect that Johnson and McEntire represented that the instrument under consideration was a lease, but not a conveyance, and that the appellants relied thereon, amounts, regardless of whether it is actionable or not, to such fraud as authorized Mrs. Richmond to attack the certificate of the notary public, notwithstanding the finding that Johnson was without knowledge that it had been improperly taken. We can but think that we properly disposed of this proposition in our original opinion, to which we may add that fraud, of itself, is not a fact; it is but a conclusion to be drawn from facts, and includes, as essential elements, an intent, actual or implied, to deceive, and a loss or injury to the person deceived. There is no finding that the representations were made with any intent to deceive, or that loss or injury to appellants resulted. On the contrary, there is evidence tending to conclusions the reverse of those, and we must therefore in support of the judgment, imply findings by the court to the effect that the representations were not false, or, if so, that they arose out of an innocent mistake as to the legal effect of the instrument, and resulted in no injury. We have been unable to find any case or authority to the effect that any such set of circumstances may be classed as a fraud cognizable by a court of equity in adjusting conflicting claims of litigants.

We deem it unnecessary to add to what has been stated in our original opinion on other subjects, and conclude that the motion for rehearing should be overruled.